May it please the Court, Lynn Nakamoto representing Appellant Roger Lay. Because Roger Lay was entitled to benefits under the severance plan at issue given a proper interpretation of its terms, he seeks reversal of the trial court's grant of summary judgment to Treesource and the denial of his own motion for summary judgment. Absent questions of the Court concerning the second issue of the amendment of the complaint, I will focus on the Court's de novo review of the ERISA benefit plan at issue. The trial court ruled that the ERISA plan in this case consists of the restated employment agreement alone and that that agreement was unambiguous. Mr. Lay contends that the Court erred on both counts. Going first to the issue of what constituted the ERISA plan in this case, the plan document should be both the restated agreement and the bankruptcy court order that was the predicate for the employment agreement issued to Mr. Lay. The company, Treesource Industries, Inc., a parent company and various subsidiaries were debtors in possession in a Chapter 11 reorganization. Treesource approached the bankruptcy court to extend and modify severance arrangements with key employees. My client, Mr. Lay, was a mill manager of a sawmill at one of the subsidiaries, Spanaway Lumber Company. The bankruptcy court issued the order with basically the consent of the senior secured lenders, and I refer to them as the lending syndicate, and actually representatives of Treesource Acquisition Company, which ultimately took over the debt position of the lending syndicate and took over their position in the bankruptcy, including with respect to all of the employment agreements. So this was in midyear. TAC was already on board. Their attorneys reviewed the order, as did the lending syndicate and Treesource Industries' own counsel. Now, as I understand it, TAC also, I don't know if it was that time or later, acquired all of the stock pursuant to the bankruptcy order. They're the sole shareholder now of Treesource. That's correct. As part of the reorganization plan, TAC was issued shares in Treesource along with some cash, I think $2 million in cash, and some notes for the debt. So in essence, TAC, there was a change in control. TAC took over Treesource Industries, and Treesource was the sole shareholder of Treesource, and Treesource was the sole shareholder of Treesource. So there was a merger of company in that. There were mergers of some of the subsidiaries into the reorganized Treesource that emerged from the bankruptcy. Well, there's no Treesource, the different company that does it. I mean, it's the same corporation. Your Honor, it was the same corporation. I can't say — And what was being eliminated were subsidiaries. The subsidiaries were moved up and put into the parent corporation. Correct, through mergers. And then there was the overall Second Amended Plan of Reorganization that was approved and that permitted Treesource to emerge from bankruptcy. I guess what I'm sort of suggesting is that the argument that says somehow there's an individual mill — I've forgotten the name of the corporation. Spanaway. It was somehow merged into the parent company. I'm kind of at a loss as to how that tracks the language of either the agreement or the order. I think I understand your argument with regard to acquisition via the Second Reorganization Plan, but the argument with regard to the subsidiary merger into the parent, I don't see how that triggers anything under either the agreement or the order. Mr. Lay's theory is that you have a merger of Spanaway Lumber Company into the parent company, and then you have an overall reorganization. The order says that — an acquirer of assets affecting the employee's place of employment, whether acquired through a purchase of assets or a merger or reorganization of the relevant debtor, that that definition of an acquirer could encompass the merger of Spanaway into the parent and then the subsequent reorganization of the parent. My problem is that Mr. Lay's employment contract, the first employment contract, clearly identifies his employer as Tresource, not Spanaway. So a merger of Spanaway into Tresource doesn't change his employer at all. No, but it affects his place of employment, which was the lumber mill at Spanaway. But he was never employed, at least under either of these agreements, by the lumber mill at Tresource. And I understand the reference to affecting the particular employee's place of employment is that the company is broken up and sent off into pieces and so forth, but that's not the way that the bankruptcy court or the reorganization went. So how a merger of Spanaway Lumber into Tresource, which already was the 100 percent owner of Spanaway Lumber, how that could trigger this provision, I just don't understand. It may be that I — it's not that I don't understand it, I hear what you say and don't accept it, but I had the feeling it seemed so far off the mark that maybe I'm missing something. Well, that is not Mr. Lay's only theory. Okay. So — It's probably just as well. Okay. We presented in the trial court this idea of a two-step acquisition, where we have the reorganization of Tresource Industries and its subsidiaries. There is an acquisition of all of the stock by TAC. And then TAC and Tresource Industries liquidates Spanaway Lumber Company assets. If that isn't a sale of assets under both the agreement itself, standing alone, and the order plus the agreement as a combined governing plan, it's — then we can only read that plan in a very narrow scope as requiring an actual sale of assets. And there is no indication from the context of the agreement itself, standing alone, and particularly when you look at the agreement plus the order, that anyone was going to read the language so narrowly. The context of this was a reorganization that had dragged on for some time, where the lending syndicate was getting impatient. There were a multiplicity of possibilities for reorganization and what would happen to these employees and their various companies. And in that context, where it is undisputed that the impetus for these agreements was to get the employees to stay, key employees like Mr. Lay operating a mill that was generating revenues for the debtors, it makes no sense to view it in a very narrow, constricted way, either the agreement alone or the agreement plus the order. And Mr. Lay certainly didn't view it that way. And so if you go back to Mr. Lay's contention that both — you must read the order and the agreement as governing documents for this plan, and I believe you should. But let me assume for the moment that you do and pose this question. Even the agreement as interpreted in the light of the order or even if it incorporated the language of the order said should have been in the agreement, does have — divides the protection into two parts. You could have a broad change of conditions clause that would apply in any event. But that's not here. The change of conditions argument applies only in the second part of the provision, the first — in the event that there's been an acquisition. If Tresource had not been acquired in some fashion, and you argue it was acquired by virtue of somebody acquiring the senior debt, if there'd been simply a reorganization and the company had survived without the de facto change in control, it would have been a reorganization, then it appears to me that you wouldn't have a leg to stand on because the change of conditions provision is limited to the acquisition scenario. Do you agree with that proposition? Yes, and I think that was the contention of in-house counsel, Mr. Bland. Well, that suggests that when you try to argue what's the intent of this agreement to give protection to the employees, the employee in the ideal world want protection under any circumstance, and yet he didn't get protection under any circumstance. If there was not some kind of acquisition, then he has no protection against the change in circumstances. Protection is limited to termination, and Mr. Lay was not terminated. If there was no acquisition, yes. So we really have to go back to viewing the meaning of that acquisition, understanding that this agreement, even read as favorably to your client as possible, did not give him the protection he's now trying to seek in the event there was no acquisition. And why would it matter to the employee what form the acquisition took? I think it mattered because then you would have the change in management that there was, and why Mr. Lay ultimately didn't stay with this company. Here we have a long-term employee who worked closely with the former CEO, Jess Drake, who had promised to protect the employees during this rocky period of time, and that's what Mr. Lay thought he had gotten. And then with all of the changes that ultimately emerged, the event's totally out of his control. His mill was closed. He was no longer the general manager of an operating mill, and I don't see the viability of TreeSource's argument that this is a question of fact for trial. Mr. Lay supervised about 100 employees, everyone, the line employees, the mill workers, everyone. And almost everyone was laid off in August, or I'm sorry, in July.  And he was the general manager of the mill. He ensured that the physical assets of the company were sold at the auction. He got that prepared, and he resigned. And he was counting on one year of salary to carry him through into his future endeavors. In the absence of the agreement, Mr. Lay does contend that the agreement itself was ambiguous on its face. Again, because the sale of assets and the definition of acquirer, or the lack of definition of acquirer in the agreement, makes it unclear how broad to read that. If, in fact, the agreement standing alone is ambiguous, then Mr. Lay should get the benefit of extrinsic evidence, such as the order, which does have a broad definition of acquirer, and the benefit of the testimony of parties involved in negotiating that order, including the main attorney in the bankruptcy for the lending syndicate, who clearly understood and testified that if an employee's position disappeared in whatever fashion as a result of that bankruptcy, that he would be entitled to severance pay unless he landed a new job with the acquirer that was very similar, that really didn't materially, adversely change anything. He would be entitled to severance pay if he landed a new job with the acquirer that would adversely change his position. Now, perhaps I should direct my comments at this point to whether or not the order and the agreement should be considered as a plan. We have here two documents that aren't in themselves, you know, your typical ERISA plan. They don't comport with all of the technical formalities required by ERISA, and there is no reason why the court should not view both as a plan, despite the integration clause, given other cases, and the fact that both were presented with a letter to Mr. Lay when he was asked to sign that agreement. In some, either viewing the agreement alone or viewing the agreement in order as a plan, summary judgment in this case in favor of tree source was error. Plaintiff also contends that summary judgment should have been granted to him, because both his interpretation, at the very least, his interpretations were reasonable. And in that case, the tie is broken in favor of plan. Thank you. I reserve my time for rebuttal. Mr. Mann. Thank you. May it please the court, Carter Mann for Tree Source Industries. Mr. Lay got exactly what he bargained for in this case. He signed this restated employment agreement that was to give him job security over a limited period of time while Tree Source was going through the uncertainty of these bankruptcy proceedings. Did he bargain for anything? Pardon me? It looks like an agreement was sent to him along with the order, said please sign here in return. He signed in return. Was there any bargaining? Well, it was the only difference between this agreement and the previous agreement he had signed was this severance provision. So in other words, the provision that's at issue wasn't bargained for. He had the option of not signing it. But the suggestion of getting what he bargained for suggests that there was a negotiation, and that doesn't appear to be the case in these facts. Well, there's no evidence that there was a negotiation. There's no evidence one way or the other whether if he had wanted a change, Tree Source would have considered it. There's just nothing in the record as to that at all. What he signed up for was that he would not lose his job. He wouldn't be fired and be out of work during the uncertainty of these bankruptcy proceedings. That's exactly what he got. He quit. He quit when there was still work to be done. Well, there was more than that. I mean, what about the whole provision about good reason? Well, Your Honor, that provision, as the district court properly held, that provision didn't apply because there were some things that had to happen in order for that language to apply. Didn't Tree Source acquire the Spanaway Mill? No, it didn't, Your Honor. The Spanaway Mill was merged into Tree Source Industries. That seemed to be what's described as being an acquisition or acquirer when it's merged. Well, the order, which is not part of the plan, says that a sale of assets could take place through a merger. That's what the order said. That language is not in the restated employment agreement. Well, didn't the order say that in words that it shall and will be incorporated, this order? The order was an enabling document, Your Honor. The case that is directly on point is the Sinelli v. Security Pacific case that we cited in our brief. That case is really on all points with what we have here and shows that the order cannot be considered in this case. In Sinelli, there was a board of directors of the company issued a resolution saying that there should be that the company shall issue a group life insurance plan, supplemental group life insurance plan that shall provide for vesting at age 60. When the plan was enacted, the plan did not have that provision. It did not provide for vesting at age 60. It said nothing about vesting. And Mr. Sinelli sent a letter saying that we've decided to enact this plan and it's going to have vesting at age 60. But the plan itself, when it was enacted, did not have that language in it. Was there anything he was called upon to sign or agree to at that point? No. He didn't sign anything in that case because at least there's no evidence in the court that he signed anything. I also didn't see that specifically referenced, but my inference is probably not. And I wonder if that takes that case away from this one where, in fact, Mr. Allais was sent the agreement to be signed because if he didn't sign, it's not like a benefits plan where the company says these are the benefits. He was being asked to sign this agreement, which he wasn't obligated to do, and he was being told this agreement was entered into with the approval of the court. Here's the court order for reference, so presumably he might have looked at the court order, and the court order says pretty specifically that the agreement shall contain this language, which for reasons which explain why we have the case, didn't make it into the agreement that he actually signed. So I understand the precedent you're citing, but I also think this case is somewhat different in that a party is being asked to take an action, in this case enter into the agreement, which wasn't the case in the Security Pacific precedent. Well, in Security Pacific, you're right. But it was important to the company to get Mr. Allais and presumably the other key employees assent to an agreement that bound them to stay because the company was going through changes and was fearful of losing employees, which is not, I mean, surely any time the company announces a benefit plan, an employee can decide, well, that's not good enough for me, I'm out of here. And sometimes with insurance and so forth, it happens. But this case is a little more precise in that the employee was being asked to commit himself to stay with the company through uncertain times. And so I understand the precedent, but it seems to me it's arguably distinguishable because in this case, the employee is being asked to take action, sign the agreement, which Mr. Sonali was not. Well, your honor, Mr. Lay testified in his deposition, and this is part of the record, that he never even looked at the order. The order was sent along with the agreement because the order was necessary. It doesn't matter what he looked at, at least in this sense. And this, I think, distinguishes it further from Sonali. Sonali didn't involve a bankruptcy court's order. In other words, here, resource couldn't enter into this agreement without the authorization of bankruptcy court. That was true also in Sonali, your honor, because the company couldn't enter into this. Couldn't amend the plan without all that case. Hell was, you know, those things weren't sufficient itself to compose a plan. But here the order says specifically that there is authorized to enter into severance arrangements as detailed in this order. And so at the very least, don't you look to the order if there's any ambiguity in the agreement to determine what the meaning of the words used in the agreement are? You could do that. Because, as Judge Clifton says, there was no negotiation between the parties. It was just implementation of the order. You could do that, your honor, if there was ambiguity. But there was no ambiguity, as the trial court found. There was no ambiguity in the plain language of the agreement. The agreement in the trial court, I think, summarized exactly why Mr. Lay is not entitled to recover severance benefits. The trial court said, before the good reason clause applies, plaintiff must have been terminated in connection with the sale of resource assets, then rehired in a comparable capacity by the acquirer of the assets. Then and only then would Lay be able to terminate his employment for good reason and claim severance benefits. Now, Mr. Lay has bent over backwards and asked the court to bend over backwards and to strain to interpret acquirer to encompass this situation where resource goes through a reorganization. But it still doesn't get him there because he has to show that he was terminated and then rehired by this acquirer. Where does it say that in either the agreement or within the order that he has to be terminated and rehired? It says that in ER 90, which is the agreement. It says the general rule, the clause is clause 3B deals with termination, and 3A deals with termination for cause. 3B deals with termination without cause. The general rule is that if tree source terminates Lay without cause during the term of the agreement, that he would be entitled to severance benefits. Now, there was no termination. Well, it depends. You could say legally the determination that, you know, there was a tree source after the TAC acquisition as a new corporation, the determination and a right and a rehiring. Well, the court found your honor, the evidence that the evidence was that tree source was the same corporation. There was no authority cited for this idea that it becomes a different company. The state of Oregon issued a certification three weeks after the reorganization became final, certifying that tree source was the same company that it had been since 1983. There's just no evidence that it becomes a different entity. Also, your honor, again, paragraph 3B talks about a sale of assets. And the clear intent is what happens when a mill is sold. If Lay's mill was sold to someone else, and he lost his job as a result of that, it requires that he be terminated in connection with the sale of tree source assets. We've got in paragraph 5 of the agreement on ER91, there's a successor liability provision, and that would apply if there was a – it could arguably apply if someone – if the ownership of the company changed or if there was an acquisition of all the stock of the company, then this whole agreement would just become binding on the successor company. 3B is meant to deal with the situation where a particular asset is sold. The mill is sold to a competitor, and Lay loses his job as a result of that. And the competitor then rehires Lay in the same capacity. All right, you're going to point to me where that is. I don't see anything about having it be fired and rehired. Okay, it's in 3B. Again, your honor. I'm looking at 3B. Okay. It says provided – the general rule is that Lay gets severance if he's fired by tree source without cause. That's the general rule. Okay. And then it creates an exception for that. The exception to the general rule is that no severance will be owed to employee if employee is terminated in connection with the sale of tree source assets but is offered by the acquirer a comparable position and the acquirer assumes the agreement. So that creates a – But I'm looking at the bottom of this where the bottom of it has a whole different provision with regard to the employee himself for good reason terminates the employment. But then it defines – your honor, then the next sentence defines good reason to mean – good reason shall mean a material adverse change by acquirer in employee's location of employment, position, responsibilities, compensation taken as a whole, and benefits. So only the – good reason could only be created by actions taken by the acquirer to materially change Mr. Lay's terms and conditions. What was the good cause that Lay was defending on? Pardon me? I said what was the good cause that Lay was defending on to invoke this provision? Well, I think it's – he argues that because the mill's operations were shut down and his duty shifted from running an active mill to winding down the operations of that mill, that that was a material adverse change. That's his argument. I think that's a fact-based determination that if the court were to determine that he was entitled to invoke the good reason provision, that would be a determination that would have to be made. But wasn't also that not only that, but eventually the whole thing was shut down, right, and everybody was moved to another location? Eventually it was. That had not happened at the time he quit. There was still – Did he quit before that happened? Pardon me? I mean, he tendered his resignation before that happened? He tendered his resignation in, I think, early September. Everybody knew it was coming? Everyone knew it was coming, yes, Your Honor, but it had not happened yet. The things were going to go to Tumwater, weren't they? Pardon me? And that the mill was going to – the operation was going to Tumwater. No, the mill was shut down, and the assets were sold. Some of the assets were sold. Actually, they all were sold eventually. But no acquirer hired Mr. Lay or terminated him or changed him. Well, where did you say the acquirer has to hire Mr. Lay? In that bottom provision where he can terminate for good reason. Good reason is defined as a change in his – if you look, Your Honor, the next to last sentence, it starts with good reason in parentheses. Shall mean? Good reason shall mean a material adverse change by acquirer in employee's location of employment, position, responsibilities, compensation taken as a whole, or benefits. So if he doesn't work for the acquirer, they can't – how can they change the terms and conditions of his – The acquirer of Spanaway was a free source, right? No, Your Honor, I would argue that's not an acquisition. That's simply – they already owned it. Spanaway was a 100 percent fully owned subsidiary. Pardon me, Your Honor? It was a merger, wasn't it? It was a merger, yes. But that's not an – TreeSource already – basically what happened is the company just – the company stock became TreeSource. There was no – TreeSource already owned it. How could they have acquired its own company, its own subsidiary? Well, an acquirer is defined as merger or reorganization. It was both. But even if they're – for sake of argument, even if they're – first of all, that's not – first of all, that issue wasn't even raised in the trial court. That wasn't – that argument was not raised either in the complaint, it wasn't raised in the amended complaint, and it wasn't properly raised at any stage of the proceedings in the district court. But even if there – even if that could be considered an acquisition, Lay was not terminated in connection with that acquisition. And, again, the language says that no severance will be owed if employee is terminated. That's the first step. With regard to that acquisition, they closed the plant. But he – Your Honor, he quit. There was still – Well, he was under that provision in the agreement and in the order, where if he had good reason to do it, and he had pretty good reason. He was the plant manager, and now there's no plant. But he was never hired. He was never hired – there was no change of – there was no change of employment. But there was a three-step process. He has to be – he has to be fired. You say a three-step process. I don't see that in the thing. All it says is that the acquirer has to do it. And if resource is defined as an acquirer, then it applies. Well, but – I'm sorry. Let me get back to what we were talking about earlier now. You say Lay invoked the good cause provision, right, that gives the employee the right to terminate for good cause. If he's entitled to rely on that provision, that's right. Right. I mean, he invoked it. The question is, did he do it, you know, validly? But his grounds for revoking it were that, right, resource told everybody we're closing the mill at the end of the summer. Isn't that right? And we're going to lay everybody off. But he was separately told that he would – Just a minute, just a minute. I'm sorry. All right. So he's the general manager of the mill, right? So he's left, you know, as a manager with nothing to manage. Now, isn't that good cause? But that's not the fact, Your Honor. Why isn't that the fact? Because he was told when the notice went out to the employees that the mill was going to close, he was separately told that there was important work that he needed to do to wind down the operation. I know the idea to wind down, but I'm still saying, isn't it good cause that a manager's factory is closed from under him? I don't think so, Your Honor. You're supposed to manage people. You know, that's what you're good at. I don't think so, Your Honor. He was in charge of managing – Well, at the very least, it's a question of fact, isn't it? I think it is. I think it is. So he didn't have to go to trial on that. Well, if the cases were mandated, we would have to go to trial on that, Your Honor. But the trial court actually talked about that issue in an oral argument on the motion for summary judgment. And as the trial court pointed out, this was a situation where Lay entered into this agreement knowing that the company's properties were going to be sold and that there was going to be a winding down of operations. What he was going to do if he hadn't quit was a necessary thing, which was helping the company wind down this operation. And he was best position of anyone to do that, but he quit. So the company didn't get what it bargained for, or what it signed up for, because he wasn't around to help wind down the operation and help tree source through this difficult time. And there's every reason to believe that he would have continued to be employed right through the December of 2002. Well, it's obvious the company is better off if they can stop paying him effective January 1, 2002, as opposed to having to pay him 12 months to October 2002. So there's no question about what the company would have done, what his actual responsibilities would have been. That's the question. Right. And it would have been a factual dispute as to whether that constituted. I'm going to ask you to focus on the term acquirer. And in particular, except for the moment, either that the bankruptcy court order is part of the plan or that the order being sent to Mr. Lay together with the agreement is being asked to sign is a potential reference point or a source to inform the agreement. Because in the bankruptcy order, you've got acquirer in quotes as a defined term, albeit with something less than a precise definition. But you've got a definition that does explicitly recognize the possibility, not just purchase of assets, but merger or reorganization. If, except this premise for the moment, if that definition is adopted, what's your position? The reason that language was included, Your Honor, in the order was in recognition that the assets, the mill, the Spanaway mill could have been sold off in a number of different ways. You could have a straight out sale of assets to a third party. At the time the order was entered into, Spanaway Lumber Company was a separate corporation, so that could have merged into a third party acquirer.  I think it was just in recognition of that. One way is that TAC, the Resource Acquisition Company, took over. So there we've certainly got some kind of a reorganization or merger. But that's a change in control. If the company, employment agreements often have change of control provisions that trigger severance. This agreement didn't have anything. It was still the same company as the State of Oregon affirmed after the reorganization. I see that I'm out of time. I didn't get to address our cross-appeal on attorney's fees, but I'm happy to answer questions about that. I think your paper has well expressed your position. Thank you. Ms. Nakamoto. Your Honor, a number of points. First on this argument by TreeSource that, you know, it was still the same company. And so it makes no sense that there was this acquisition, because we just still have the same TreeSource Industries. And I think that's belied by the order, because if you look at the order, it talks about, it's a focus on the acquisition of the debtor's assets, the debtor's assets. And remember, we're in a bankruptcy. And so it does make sense that you could get the parent company emerging from bankruptcy and acquiring some portions of its debtor subsidiaries, some portions being sold off to third parties. It makes perfect sense that we had an acquisition in this case, even though the entity, TreeSource Industries, Incorporated, survived the bankruptcy. On Cinelli, the Court was looking at differentiating this case from the circumstances there. And I think another point of differentiation is the fact that the corporate resolution in that case clearly, I mean, it was written as a recommendation. There was not even an attempt to state that it was a requirement of the officers of the company to go forward with the change in the life insurance policy. And here we have a bankruptcy court order, two debtors in possession, who presumably are officers of the court acting as fiduciaries. And they represented to the bankruptcy court that they would do this. They represented to others in the bankruptcy in their disclosure statement that they would do this for their employees. It makes perfect sense that Mr. Lay should be entitled to rely on the documents themselves that were issued, which is not to say that I'm arguing that we must show his actual reliance, but that the company should be held to the standards in its own documents, including the order that it sought and received from the bankruptcy court. How about viewing TAC as an acquirer by getting the stock pursuant to bankruptcy orders? That was a theory, and also the merger theory. And I just want to point out to the court that the merger theory was, in fact, presented to the district court. I want to assure the court of that. And you can look at Mr. Lay's second supplemental excerpts of record, for example, at SER 32 to 33. Thank you very much. For all of these reasons, Mr. Lay respectfully requests reversal of the trial court decision in its entirety and entry of judgment for him. Thank you. Thank both counsel for your arguments. It, along with all the other cases argued today, are submitted, and we are in recess until tomorrow morning. Thank you. This court is adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Hug, Tashima, Clifton